# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 1, 2008 Session

## STATE OF TENNESSEE v. KENNETH C. DAILEY, III

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2004-B-1779      Steve R. Dozier, Judge**

---

**No. M2007-01874-SC-R11-CD - Filed January 2, 2009**

---

We granted permission to appeal the Defendant's certified question of law to determine whether the police violated the Defendant's constitutional rights by subjecting him to a custodial interrogation without first informing him of his constitutional rights as required by the Supreme Court's decision in <u>Miranda v. Arizona</u>. We hold that the Defendant's confessions, both obtained in violation of his federal and state constitutional privileges against self-incrimination, should have been suppressed. Accordingly, the Defendant's conviction must be vacated and the charge dismissed.

### Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed; Conviction Vacated; Charge Dismissed

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., and E. RILEY ANDERSON, SP. J., joined.

J. Carlton Drumwright, Brentwood, Tennessee, for the appellant, Kenneth C. Dailey, III.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Elizabeth T. Ryan, Associate Deputy Attorney General; Victor S. Johnson III, District Attorney General; and Pamela Sue Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**PROCEDURAL BACKGROUND**

This matter is before us for the second time. After being charged with first degree murder, the Defendant filed a motion to suppress two incriminating statements he made to police officers concerning his role in the victim's homicide on the basis that he had been subjected to a custodial interrogation without the requisite Miranda warnings. After a hearing, the trial court denied the Defendant's motion. The Defendant subsequently entered a guilty plea to second degree murder but reserved for appeal the following certified question of law regarding the admissibility of his statements:

> Whether the Defendant was subjected to a custodial interrogation by Metro Police Detectives on or about May 4, 2004 such that his subsequent statements were taken in violation of his rights pursuant to Article 1, Section Nine of the Tennessee Constitution, the Fifth Amendment of the United States Constitution and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The Defendant gave two statements to detectives on May 4, 2004. No *Miranda* warnings were given by the detectives prior to the first statement given by Defendant. It is the Defendant's position that this was a custodial interrogation thereby requiring *Miranda* warnings. Immediately following Defendant's first statement, *Miranda* warnings were given by the detectives and the Defendant gave a second statement. It is the Defendant's position that this second statement was obtained by the detectives using interrogation techniques expressly rejected by the United States Supreme Court in *Missouri v. Seibert*, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Testimony was given by Detective Mike Roland that the State's proof of Defendant's guilt consists entirely of the statements he gave on May 4, 2004 thereby making this question dispositive of the case.

> The parties agree and the Court affirms that the certified question set out above is expressly reserved as part of the plea agreement and that all parties consent to this reservation. Further, all parties agree that this question is dispositive of the case.

On appeal the first time, the Court of Criminal Appeals dismissed the appeal on the grounds that the record "does not demonstrate that the certified question is dispositive of the case." We granted permission to appeal and disagreed with the intermediate appellate court's analysis, concluding that the certified question was dispositive. We therefore remanded the case to the Court of Criminal Appeals for its consideration of the certified question on its merits.

On remand, the Court of Criminal Appeals concluded that the evidence did not preponderate against the trial court's determination that the Defendant had not been in custody when he made his initial confession. The intermediate appellate court therefore affirmed the trial court's denial of the Defendant's motion to suppress. We granted the Defendant's application for permission to appeal.

2

# FACTS

Metro Nashville police Detective Mike Roland testified at the suppression hearing that, in April 2004, a woman's severely decomposed body was found in an abandoned vehicle at Tommy's Wrecker Service in Davidson County. A piece of rope was wrapped around the woman's neck. The victim was transported to the Medical Examiner's Office for examination and was identified as Nancy Marie Lyons.

In an attempt to discover information about the victim, Det. Roland interviewed several of the Wrecker Service's employees. In conjunction with the investigation, all of the employees were asked to submit "elimination [finger]prints." The Defendant, Kenneth C. Dailey, III, was one of the employees interviewed and fingerprinted by the police. Although they had no forensic or other evidence linking the Defendant to the body, the police, based upon "gut feelings and instincts," subsequently decided that they wished to interview him further. Det. Roland asked the son of the owner of Tommy's Wrecker Service to tell the Defendant that the police needed to retake his fingerprints.

Det. Roland admitted that the real reason for requesting the Defendant to come down to the police station was to interview him and that a second fingerprinting was unnecessary. Det. Roland also testified that, at the time the Defendant reported for his second meeting with the police, they did not have probable cause to arrest him. Indeed, Det. Roland stated that he "had no evidence to arrest [the Defendant] on" and that he "had nothing on him." The decision to ask for new prints was made because the officer "didn't wanna [sic] scare him."

According to Det. Roland, the Defendant drove to the station at the appointed time and parked across the street. When the Defendant entered the police station, Det. Roland met him in the front lobby and asked him "if it was okay if [they], maybe, talked a little bit before [they] did the [finger]prints." Det. Roland described their initial interaction as "pleasant." When the Defendant agreed to speak with Det. Roland, the officer escorted him back to an interview room in the Criminal Investigations Division ("CID") area. The men passed through two sets of interior doors to reach the CID area. Det. Roland asked the Defendant to take a seat behind the table in the interview room. After the Defendant did so, Det. Roland left to retrieve his paperwork. Det. Roland testified that the Defendant was not in custody at this time and was not handcuffed; while he was gone, Det. Roland left the interview room door open and unguarded. When Det. Roland returned to the interview room, he was accompanied by Sergeant Pat Postiglione. They entered the interview room and closed the door behind them. Det. Roland testified that he was armed during the interview; he did not recall whether Sgt. Postiglione was armed. Det. Roland and Sgt. Postiglione proceeded to interview the Defendant.

The interview was videotaped and this Court has reviewed the tape. It shows the Defendant seated in a back corner of the room at a diagonal from the door, facing a table. Det. Roland is seated across the table and facing the Defendant. Sgt. Postiglione appears to be seated in front of the door, facing the Defendant. The following summarizes the events portrayed on the videotape.

3

The interview began with a few minutes of casual conversation about unrelated matters. The Defendant volunteered some information about how he sometimes closed up the wrecker shop, beginning with, "One thing I forgot to tell you," referring to his earlier conversation at the wrecker shop with an officer. All three men spoke in a conversational tone throughout the interview.

After approximately three minutes, Det. Roland asked the Defendant whether he had worked the weekend before the victim's body had been found. The Defendant answered affirmatively. Sgt. Postiglione then asked the Defendant if he worked every weekend, and the Defendant responded that he worked one weekend a month for the Wrecker Service. The Defendant explained that he would go to Tommy's Wrecker Service at 6 p.m. on the Saturdays he worked, close up the business at 10 p.m., leave in the business truck, and then return Sunday morning. Det. Roland then asked the Defendant if he remembered asking Det. Roland during the initial investigation whether the police would be able to solve the crime. The Defendant stated that he remembered asking that question and clarified that he was simply curious. Det. Roland then stated that they had "pretty much concluded" their investigation and told the Defendant that "this is where it gets a little bit tough for you."

Det. Roland informed the Defendant that his fingerprints had been found "in a place they shouldn't have been." The Defendant asked whether his prints had been found inside the car. Det. Roland responded that he was not going to tell the Defendant all of the information that he had. Det. Roland then told the Defendant that the matter was "very serious" for the Defendant and that the reason he wanted the Defendant to come to the station was to give the Defendant an opportunity to talk to them about the matter because the Defendant was "right in the middle of it." The Defendant responded, "okay."

Det. Roland told the Defendant that the problem he had was not *whether* the Defendant was involved (in the victim's death), but *why* her death happened. He told the Defendant he wanted to know "why did this lady die?" The Defendant answered, "I have no idea, I know nothing about it." Det. Roland then assured the Defendant that there was "no way around" the evidence they had and that the evidence was "there." Det. Roland acknowledged that the Defendant had a wife and son and stated that he did not see the Defendant as a "cruel, mean person." Det. Roland then told the Defendant that he needed the Defendant to tell him what happened, to help him determine "where we go from here." Det. Roland continued, informing the Defendant that if they went "strictly on the evidence," they would have to charge the Defendant with first degree murder. If the Defendant had a good explanation for the victim's death, however, it was possible that they could proceed with a lesser charge.

Sgt. Postiglione then explained that whatever information the Defendant provided to them would be turned over to the district attorney. Sgt. Postiglione informed the Defendant that, if he said nothing, the victim's death looked like a cold-blooded ruthless killing. He told the Defendant that they knew he was involved, that they were okay with that, but that they wanted him to explain "exactly why this happened." The Defendant acknowledged what Sgt. Postiglione was telling him by repeating "uh huh" a couple of times.

4

Det. Roland resumed speaking to the Defendant, telling him that they knew this was not the first time the Defendant had picked a girl up. He told the Defendant that they knew "more than what you can imagine." The Defendant protested, "I hadn't picked up a girl." Det. Roland contradicted the Defendant and then told him that there were "so many things about the forensics that you don't understand." He told the Defendant that they could have simply come out and picked the Defendant up and "just done our thing," but that he felt the victim's death might have been accidental or occurred during a robbery. Det. Roland posited that there were several possible explanations for the victim's death and that he did not feel it was "ruthless." He then told the Defendant that the Defendant was the only person who could give them an explanation. Det. Roland emphasized that it would not help the Defendant "at all" to refuse to talk to them.

Sgt. Postiglione interjected that, if the Defendant did not tell them what happened, then it appeared he was covering something up and that he was a cold-blooded individual. The Defendant retorted that he was "not a cold-blooded individual."

Det. Roland resumed and told the Defendant, "now is when you need to talk to us." The Defendant challenged them on the fingerprints. Sgt. Postiglione responded they had found prints that "only the person involved in the homicide would've left." Sgt. Postiglione reiterated that they already knew that the Defendant was involved in the homicide and reminded the Defendant that he had a family. Sgt. Postiglione advised the Defendant not to paint himself into a corner.

Sgt. Postiglione continued, telling the Defendant that Det. Roland had been on the case "24/7," that they were not mad at the Defendant, that they did not think he was a monster, but that he had to explain "why this occurred." The Defendant responded, "I don't know what to say."

Both officers told the Defendant, "tell us what happened." Det. Roland added that the Defendant was backing himself into a corner, into a bad position, and that the only way the Defendant could help himself was to tell them the truth. Det. Roland told the Defendant that he was "going to have to answer, obviously, for what's happened, there's no doubt about it." Sgt. Postiglione advised the Defendant to explain in as much detail as he could, and they would then go from there. He told the Defendant that they understood he was nervous and that they thought he got caught up in something. The Defendant again responded, "I don't know what to say." Sgt. Postiglione told the Defendant that telling them what had happened would "relieve" him, acknowledging that the Defendant had a heart and soul.

Det. Roland next asked the Defendant, "where did you meet her at?" The Defendant paused and then responded, "Murfreesboro Road." Sgt. Postiglione then advised the Defendant to "go through it like a story." The Defendant explained that he had picked the victim up, and she indicated that she wanted to go back to the Defendant's place. They drove back to the wrecker business. The victim wanted more money. She threatened him. The Defendant stated, "I don't know after that." He said that the next thing he knew, she was laying there. He thought he pushed her down, he was upset, and the next thing he knew, "she was dead."

Det. Roland asked, "how was she dead?" and Sgt. Postiglione told the Defendant that it was important for him to remember the details. The Defendant then told the officers that he was on top of her, he had his hands around her throat, and that he tried to cover up what he had done by putting a piece of rope around her neck. Det. Roland asked a number of specific questions about the rope, which the Defendant answered. The Defendant also told the officers that he took the victim's body and put it in one of the cars on the lot.

After hearing the Defendant's explanation of killing the victim, Det. Roland told the Defendant, "You understand that you have to be charged with something?" Det. Roland then said, "I want to make this official because that's what's going to help you," and told the Defendant that he had to read him his rights. Det. Roland asked the Defendant if he had ever had his rights read to him before, to which the Defendant responded, "no." The Defendant asked Det. Roland, "does this mean I'm staying here tonight?" Det. Roland repeated that he was "making it official" and that meant the Defendant would be staying the night. By this point, approximately twenty-one minutes had elapsed since the conversation began.

Det. Roland then read the Defendant his rights, during which the Defendant stated that he was willing to talk. Det. Roland reviewed the rights waiver with the Defendant, and the Defendant signed the waiver. Det. Roland and Sgt. Postiglione resumed questioning the Defendant. No break was taken and none of the men left the interview room. At no time did Det. Roland or Sgt. Postiglione tell the Defendant that the statement he had just given would not be admissible against him.

During the initial phase of the second round of questioning, Det. Roland made a couple of general references to their pre-warning conversation. Overall, however, the second round of interrogation consisted of the Defendant repeating his confession, adding a few details,[1] and answering additional specific questions by the officers; for instance, how much money the victim charged him, what had he done with the victim's purse, and questions about his past activities in New York and Florida. At the end of the second round, the officers informed the Defendant that he would be charged with a "standard criminal homicide charge." The second round of questioning took approximately eleven minutes.

## STANDARD OF REVIEW

On appeal from a denial of a motion to suppress, we review the trial court's legal conclusions de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). We will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates to the contrary. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, where the evidence includes a complete and accurate videotape depiction of the police interview which is the subject of the suppression hearing, the trial court's

---

[1] The Defendant stated specifically during the second round of questioning that he and the victim had sex at the wrecker shop and that they then argued over how much money he owed her.

findings of fact with respect to the matters depicted on the videotape are also subject to de novo review. State v. Payne, 149 S.W.3d 20, 25 (Tenn. 2004).

## ANALYSIS

### I. Questioning in a Custodial Setting:  Miranda v. Arizona

This case requires us to reemphasize a criminal defendant's fundamental constitutional right against compelled self-incrimination as explicated in the seminal Supreme Court case of Miranda v. Arizona, 384 U.S. 436 (1966).  In that case, the Supreme Court undertook an exhaustive examination of the tension between the government's interest in obtaining confessions of criminal behavior and "the privilege against self-incrimination–the essential mainstay of our adversary system."  Id. at 460.  That privilege is set forth in the Fifth Amendment to the United States Constitution:[2]  "No person . . . shall be compelled in any criminal case to be a witness against himself."[3]  After observing that "[w]e sometimes forget how long it has taken to establish the privilege against self-incrimination, the sources from which it came and the fervor with which it was defended," Miranda, 384 U.S. at 458, the Court set forth a long line of historical precedent for the Fifth Amendment, including the Bible, id. at 459 n.27, and the 1637 trial of John Lilburn, id.  The Court then observed that

> we may view the historical development of the privilege as one which  groped for the proper scope of governmental power over the citizen.  As a 'noble principle often transcends its origins,' the privilege has come rightfully to be recognized in part as an individual's substantive right, a 'right to a private enclave where he may lead a private life.  That right is the hallmark of our democracy.' . . . All these policies [underlying the right against self-incrimination] point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government–state or federal–must accord to the dignity and integrity of its citizens.  To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.  In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'

Id. at 460 (citations omitted).

---

[2]The Tennessee Constitution also protects individuals against compelled self-incrimination:  "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."  Tenn. Const. art. I, § 9.

[3]The Fourteenth Amendment secures application of the Fifth Amendment to the several states.  Malloy v. Hogan, 378 U.S. 1, 8 (1964).

Upon recognizing that the Court had "consistently . . . accorded a liberal construction" to the privilege against self-incrimination, id. at 461, the Court famously held as follows:

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. . . . [Accordingly,] [h]e must be warned *prior to any questioning* that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

Id. at 478-79 (emphasis added); see also Oregon v. Elstad, 470 U.S. 298, 306 n.1 (1985) (observing that "[a] Miranda violation does not *constitute* coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements"); Walton, 41 S.W.3d at 86.[4]

By its own terms, Miranda applies to the questioning of an individual who has been "taken into custody or otherwise deprived of his freedom by the authorities in any significant way." 384 U.S. at 478. Our first step toward responding to the certified question in this case is therefore a determination of whether the Defendant was in custody during his initial interrogation by Det. Roland and Sgt. Postiglione or whether his custody did not commence until the point at which Det. Roland delivered the Miranda warnings.

*II. Defining "Custodial": Anderson*

In State v. Anderson, 937 S.W.2d 851 (Tenn. 1996), this Court held that the test for determining whether a person is in custody so as to be entitled to the warnings required by Miranda is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." Id. at 855; see also Berkemer v. McCarty, 468 U.S. 420, 442 (1984). To assist in applying this test, the Anderson court set forth a non-exclusive list of factors relevant to that "objective assessment," including

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method

---

[4]While the State may not use an unwarned confession in its case-in-chief, such a confession may be admissible for impeachment purposes against a defendant who testifies. See Harris v. New York, 401 U.S. 222, 224-26 (1971); State v. Harts, 7 S.W.3d 78, 85 (Tenn. Crim. App. 1999).

of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

937 S.W.2d at 855. This Court stressed that the determination of whether a suspect is in custody for Miranda purposes is a "very fact specific inquiry." Id.

The trial court in this case determined that the Defendant was not in custody prior to the delivery of the Miranda warnings based upon its findings that the Defendant arrived at the police station voluntarily; was not handcuffed; agreed to speak with Det. Roland; was in the interview room alone and with the door open for a period; that Det. Roland's "tone and demeanor were courteous and polite"; that there were no limitations on the Defendant's movement "other than one of the detectives being positioned between the defendant and the door"; and that the Defendant never asked to leave or to consult an attorney. The trial court concluded that "the defendant was not in custody until after he made the initial incriminating statements to the detectives." The trial court failed to explain, however, what precisely changed in the Defendant's circumstances after his initial confession to transform his situation from noncustodial to custodial. Our review of the record indicates that the only change was Det. Roland's statement to the Defendant that he would have to be charged with something and that Det. Roland "want[ed] to make this official because that's what's going to help you." At that point, Det. Roland told the Defendant that he (Det. Roland) needed to read the Defendant his rights.

On appeal, the Court of Criminal Appeals concluded that the evidence did not preponderate against the trial court's finding that the Defendant was not in custody prior to receiving his Miranda warnings. As additional support for its conclusion, the intermediate appellate court noted that the initial portion of the interview lasted approximately twenty-one minutes; the door of the interview room was not locked; and the Defendant never requested to call anyone. The intermediate appellate court also determined that the Defendant's question to Det. Roland as to whether he would have to spend the night at the police station after Det. Roland informed him that Det. Roland had to "make it official" indicated that, until that point, the Defendant "believed he was free to leave."

Upon our review of Det. Roland's testimony at the suppression hearing and the videotape of the interview, we disagree with the Court of Criminal Appeals and hold that the evidence establishes that the Defendant was in custody prior to being given the Miranda warnings.

Applying the Anderson factors, we find that the preponderance of the evidence establishes the following. The Defendant drove himself to the police station during the early evening on the false pretext that he was going to be fingerprinted again to assist in the police investigation. Upon his arrival, one of the investigating detectives instead asked if he would first talk to them. The

9

interview took place in a small interrogation room located in a secured portion of the building. The initial phase of the interview was not prolonged. The character of the questioning was accusatory and demanding, aimed at convincing the Defendant that the police already had sufficient evidence to convict him of murdering the victim and that he had to give them an explanation. Det. Roland's and Sgt. Postiglione's tone of voice and general demeanor were conversational; however, at least one of the officers was armed.[5] Two officers questioned him. The Defendant's movements were restrained to the extent that he was placed in the back corner of a small room with one door, the door was closed, and a police officer was sitting between the Defendant and the closed door. The interactions between the Defendant and the officers consisted of a few prefatory comments about the Defendant's practice of homeschooling followed by increasingly focused accusations and questions about the Defendant's involvement in the victim's death. Only a few minutes into the interrogation, Det. Roland told the Defendant that if he went "strictly on the evidence, [he had] to charge [the Defendant] with first degree murder." The Defendant's initial responses ran the gamut from unequivocal denials to challenges to statements of "I don't know what to say." Eventually, after having been repeatedly told that the officers knew the Defendant was involved in the victim's death and just needed the details as to why, and that the police already had sufficient evidence to convict him of first degree murder, the Defendant confessed to killing the victim. The officers never informed the Defendant that he was free to refrain from answering questions or that he was free to end the interview until after they had extracted a confession from him.

This full recitation of the totality of the circumstances surrounding the Defendant's initial questioning convinces us that a reasonable person in the Defendant's position would have considered himself or herself "deprived of freedom of movement to a degree associated with a formal arrest," at least by the point at which Det. Roland stated, "if I go strictly on the evidence, I have to charge you with first degree murder." The Defendant's eventual question about whether he would have to spend the night–made only after Det. Roland informed him that they had to "make this official"–does not, in our estimation, imply that the Defendant believed up until that point that he was free to leave. It is equally likely that he may have been wondering about the opportunities for bail, or he may have hoped that he would be allowed to turn himself in the next day after informing his family of what had happened. In any event, speculation about the Defendant's exact state of mind at the time he asked the question is unnecessary and irrelevant: the inquiry focuses on what a reasonable person in the Defendant's position would have concluded from the circumstances in which he found himself, not what the Defendant may actually have been thinking at the time.

### III. "Question-First" Interrogation: *Missouri v. Seibert*

Having determined that the Defendant was in custody for purposes of Miranda at the time he gave his initial unwarned confession, we next consider whether the later warnings cured the Miranda violation. In Missouri v. Seibert, 542 U.S. 600 (2004), the United States Supreme Court considered a case in which the police arrested the defendant, took her to the police station, questioned her about a crime for thirty to forty minutes without the benefit of Miranda warnings, extracted a confession, and then gave her a twenty minute break. Upon resuming the questioning

---

[5]This is to be expected, of course, when an on-duty police officer conducts the interview.

after the break, the police provided the defendant her <u>Miranda</u> warnings, and she then executed a waiver. A second confession followed. After she was charged with first degree murder, the defendant moved to suppress both her prewarning and postwarning statements. The trial court suppressed the prewarning statement but allowed the State to use the postwarning statement. A jury subsequently convicted the defendant of second degree murder.

At the Supreme Court, the case generated four separate opinions, with five justices ultimately concurring that the postwarning statement was inadmissible and four justices dissenting on that issue. In addressing the interrogation tactics used by the police in <u>Seibert</u>, the plurality opinion first noted that "[t]he technique of interrogating in successive, unwarned and warned phases," a technique the plurality referred to as "question-first," had been promoted by "a national police training organization" with the object of "render[ing] <u>Miranda</u> warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." <u>Id.</u> at 609-11. In assessing the constitutionality of the practice in light of <u>Miranda</u>, the plurality determined that

> [t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as <u>Miranda</u> requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with <u>Miranda</u>, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

<u>Id.</u> at 611-12. The plurality was skeptical about the efficacy of <u>Miranda</u> warnings under such circumstances, observing that "it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." <u>Id.</u> at 613.

The plurality then set forth a five-factor test pertinent to determining whether late <u>Miranda</u> warnings are effective:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogation], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first [round of questioning].

<u>Id.</u> at 615. Applying these factors to the case before it, the plurality held the post-warning statement to be inadmissible. <u>Id.</u> at 617. In support of this conclusion that the eventual <u>Miranda</u> warnings were ineffective, the plurality opinion observed the following:

11

The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the Miranda warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation . . . . The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

Id. at 616-17 (footnotes omitted).

In a separate opinion, Justice Kennedy agreed that the postwarning confession by the defendant in Seibert was not admissible. He disagreed with the plurality's analysis, however, explaining that the plurality's test

envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations. In my view, this test cuts too broadly. Miranda's clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity.

Id. at 621-22 (Kennedy, J., concurring in judgment) (citation omitted). Justice Kennedy preferred to apply the principles of Oregon v. Elstad which held that "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," did not necessarily taint a subsequent, warned confession. Elstad, 470 U.S. at 309. Thus, Justice Kennedy would look to whether the police deliberately employed the "two-step strategy" and, where they did, Justice Kennedy would exclude a postwarning statement that was related to the substance of the prewarning statement "unless curative measures [were] taken before the postwarning statement [was] made." Seibert, 542 U.S. at 622 (Kennedy, J., concurring in judgment). Justice Kennedy offered as one example of a curative measure, "a substantial break in time and circumstances between the prewarning statement and the Miranda warning." Id.

*IV. Applying Seibert: State v. Northern*

This Court was first called upon to apply Seibert in State v. Northern, 262 S.W.3d 741 (Tenn. 2008). In Northern, the police arrested the defendant on drug charges and brought him down to the police station. Prior to issuing Miranda warnings, the police sat the defendant in the center of the "Murder Squad Office" where the defendant was surrounded by detectives. The detectives discussed among themselves a shooting in which they suspected the defendant. "In general, the conversation minimized the shooter's responsibility and implied that the victim assumed the risk of being murdered when he drove late at night into a neighborhood notorious for crime." Id. at 745. The defendant listened to this conversation for about twenty minutes and then spontaneously announced that he had been present at the shooting. At that point, one of the detectives relocated the defendant to an interview room and turned on a videocamera. The detective administered the Miranda warnings and went over a rights-waiver form with the defendant, which the defendant signed. The officer then interrogated the defendant about the shooting, to which the defendant "confessed readily." Id. at 761.

In a challenge under Seibert, we held that the initial conversation between the police officers in the defendant's presence functioned as the equivalent of an interrogation for the purposes of Miranda. Northern, 262 S.W.3d at 753. Therefore, the overall interrogation was nominally two-step. We then undertook a careful examination of the several opinions written in Seibert. Id. at 757-60. We recognized that Justice Breyer indicated in his separate concurring opinion a preference for a "simple rule" that would "apply to the two-stage interrogation technique" and which would require courts to "exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." Seibert, 542 U.S. at 617 (Breyer, J., concurring). Justice Breyer nevertheless joined in the plurality opinion "in full." Id. at 618. Justice Kennedy expressed a preference for "a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Id. at 622 (Kennedy, J., concurring in judgment). Eventually, we found it unnecessary in Northern "to foretell which, if any, of the Seibert approaches will eventually garner the agreement of a majority of the [J]ustices," Northern, 262 S.W.3d at 760, because we determined that the Miranda warnings given prior to the second interrogation in Northern were effective under any of the analyses articulated in the various Seibert opinions, id. In this case, we again determine that it is unnecessary to predict the eventual outcome of the competing Seibert approaches because we find that the Defendant's postwarning confession is inadmissible under either the plurality's or Justice Kennedy's test.[6]

---

[6]With respect to the multiple opinions generated by Seibert, we reiterate our observations in Northern:

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 49 L. Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)); see also Coe v. State, 17 S.W.3d 193, 209 (Tenn. 2000). Tallying the votes from the various Seibert opinions provides only minimal clarity as to the analysis governing the issue in this case. Justice Kennedy's concurring opinion is generally viewed as more narrow than the plurality opinion. [See Edwards v.

*V. Application of the <u>Seibert</u> Plurality Test in this Case*

The first factor of the five-factor <u>Seibert</u> plurality test to determine whether the two-step "question-first" interrogation used in the instant case passes constitutional muster is "the completeness and detail of the questions and answers in the first round of interrogation." 542 U.S. at 615. In this case, Det. Roland and Sgt. Postiglione obtained a complete and detailed confession from the Defendant before administering the <u>Miranda</u> warnings. The officers' questioning was pointed and executed with psychological skill. In response to their questions and claims of incriminating evidence, the Defendant told them where he picked up the victim, where they went, why they argued, how he killed her, what he did in an attempt to hide that he strangled her, and what he did with her body. Were the Defendant's initial confession admissible, it would have been sufficient to support the Defendant's conviction of second degree murder.[7] <u>See</u> Tenn. Code Ann. § 39-13-210 (2003). This factor weighs heavily against the efficacy of the tardy <u>Miranda</u> warnings.

The second <u>Seibert</u> plurality factor is "the overlapping content of the two statements." <u>Seibert</u>, 542 U.S. at 615. In this case, the overlap was considerable. Only minor details were elicited in the second statement that were not also obtained in the first. This factor, too, weighs heavily against the effectiveness of the late <u>Miranda</u> warnings.

The third factor is "the timing and setting of the first and the second" interrogations. <u>Id.</u> In this case, the second interrogation took place mere minutes after the first interrogation, with no break in time. The second interrogation took place in the same place as did the first: a small interrogation room in a secured area of the police station. The second interrogation was conducted by the same two police officers who conducted the first interrogation, the fourth <u>Seibert</u> factor. Both of these factors weigh against the effectiveness of the eventual <u>Miranda</u> warnings.

---

<u>United States</u>, 923 A.2d 840, 848 n.9 (D.C. 2007) (citing cases holding that because Justice Kennedy's concurring opinion in <u>Seibert</u> is more narrow than the plurality opinion, his opinion is of special significance).] However, Justice Kennedy's focus on the interrogating officer's intent is directly inconsistent with the reasoning of the other plurality justices and with the reasoning of the dissenting justices. In light of the seven votes explicitly rejecting Justice Kennedy's intent-based test, disagreement exists concerning the analysis that <u>Seibert</u> instructs courts to apply when determining the admissibility of postwarning statements. <u>See, e.g.</u>, <u>Edwards v. United States</u>, 923 A.2d 840, 848 (D.C. 2007) (observing that "there is some disagreement concerning the precise analysis that <u>Seibert</u> mandates"); <u>United States v. Carrizales-Toledo</u>, 454 F.3d 1142, 1151 (10th Cir. 2006) ("Determining the proper application of the <u>Marks</u> rule to <u>Seibert</u> is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court."); <u>United States v. Stewart</u>, 388 F.3d 1079, 1090 (7th Cir. 2004) (reading the plurality's balancing test into Justice Kennedy's requirement of "curative steps"); <u>see also</u> Daniel S. Nooter, <u>Is Missouri v. Seibert Practicable?: Supreme Court Dances the "Two-Step" Around Miranda</u>, 42 Am. Crim. L. Rev. 1093, 1094 (Summer 2005).

262 S.W.3d at 759-60 (footnote placed in brackets). We also recognize that two of the Justices who participated in <u>Seibert</u> are no longer on the Supreme Court, rendering its eventual construction by the Court even more speculative.

[7]The circumstances surrounding the victim's body would have provided the necessary corroboration. <u>See State v. Smith</u>, 24 S.W.3d 274, 281 (Tenn. 2000).

14

The fifth and final factor looks to "the degree to which the interrogator's questions treated the second round as continuous with the first." Id. In this case, Det. Roland and Sgt. Postiglione treated the two rounds of questioning as two portions of the same whole: the second being merely the "official" portion. At no time did either of them inform the Defendant that his initial statement could not be used against him. Cf. id. at 616. "Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led [him] through a systematic interrogation." Id. Moreover, during the second round of questioning, Det. Roland referred, albeit briefly and only twice, to the Defendant's initial statement. Cf. id. As in Seibert, "[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." Id. at 616-17. Indeed, we are confident that a reasonable person in the Defendant's shoes would have considered his second statement to be a forgone conclusion, a nicety that simply gave him another opportunity to demonstrate his cooperativeness in the hopes of something less than a first degree murder charge.

In this case, all five of the Seibert plurality factors weigh against the effectiveness of the tardy Miranda warnings. This case is therefore distinguishable from Northern in which we determined that only one of the five factors (the continuity of police personnel) posed a threat to the effectiveness of the late warnings. See Northern, 262 S.W.2d at 761-63. We emphasize that, unlike the defendant in Northern, the Defendant in this case was not warned of his right to remain silent until after he had already confessed in response to specific, targeted questions. Uninformed about the inadmissibility of his first statement, the Defendant had no way to know that a postwarning refusal to incriminate himself would be in any way effective. We find, therefore, that a reasonable person in the Defendant's shoes would not have understood the eventual Miranda warnings given in this case to have "convey[ed] a message that [he] retained a choice about continuing to talk." Seibert, 542 U.S. at 617. Accordingly, the tardy Miranda warnings in this case were not effective to apprise the Defendant that he had a real, consequential opportunity to choose to remain silent at that point.

*VI. Application of Justice Kennedy's "Narrower Test"*

Applying Justice Kennedy's test in this case, we first consider whether the police officers deliberately employed the two-step interrogation technique so as to undermine the eventual Miranda warnings. Det. Roland was asked during cross-examination at the suppression hearing whether it was "a conscious decision on [his] part, before [he] interviewed [the Defendant], not to give him Miranda warnings?" Det. Roland responded, "It was a very conscious decision, that he was not under arrest, that I had no evidence to arrest him on, and that it was absolutely no reason to read him his Miranda rights."[8] Thus, Det. Roland readily admitted that he consciously decided not to provide

_____

[8]Of course, whether a suspect is "under arrest" does not depend on the officer's subjective analysis. "The subjective intent of the officer is relevant to the assessment [of whether a person has been arrested] only to the extent that the officer's intent has been conveyed to the person confronted." State v. Crutcher, 989 S.W.2d 295, 304 (Tenn. 1999) (Drowota, J., dissenting). Det. Roland never informed the Defendant about his subjective understanding that he had no evidence upon which to base an arrest of the Defendant. To the contrary, Det. Roland repeatedly informed the Defendant that he *did* have enough evidence to support the Defendant's arrest. See also Berkemer, 468 U.S. at 442 (holding that "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at

15

the Defendant with <u>Miranda</u> warnings, but protested that the circumstances did not require them. This response highlights the difficulties with applying Justice Kennedy's test.[9] A test that focuses on the subjective mind-set and motivations of the interrogating police officer(s) creates the possibility that a police officer could manipulate the scene of the interrogation and then subsequently claim that his failure to issue <u>Miranda</u> warnings was in "good faith." This circular reasoning is not helpful to the crucial question of whether tardy <u>Miranda</u> warnings function effectively.

We find that Det. Roland and Sgt. Postiglione deliberately set the stage for the Defendant's two-step interrogation so as to undermine his eventual <u>Miranda</u> warnings. In support of this conclusion, we emphasize the false pretenses under which the Defendant was called to the police station, the officers' failure to advise the Defendant during the first stage of the interrogation that he was not under arrest and that he was free to leave at any time, and their subsequent failure at the commencement of the second stage of the interrogation to inform the Defendant that his initial statement would not be admissible against him.

The second prong of Justice Kennedy's test is whether sufficient curative measures were taken prior to the Defendant's second confession "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the <u>Miranda</u> warning and of the <u>Miranda</u> waiver." <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring in judgment). We hold that no such sufficient curative measures were taken in this case. Again, the officers failed to inform the Defendant that his first confession would not be admissible against him. There was no break in time, place, or personnel, and the only indication that *anything* about the Defendant's circumstances had changed was Det. Roland's declaration following the Defendant's initial statement that they had to "make it official." No reasonable person in the Defendant's position at that time and under those circumstances would have understood the import and effect of the post-confession <u>Miranda</u> warnings and waiver.

Our conclusion that the Defendant's postwarning confession was not admissible under either of the <u>Seibert</u> approaches leaves us with no choice but to find that the Defendant's motion to suppress both of his statements should have been granted because his initial statement was taken in violation of his Fifth Amendment right against self-incrimination, and the tardy <u>Miranda</u> warnings did not function effectively so as to render his second statement admissible.

---

a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"). We also recognize, as has the Supreme Court, that "the task of defining 'custody' is a slippery one, and 'policemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever.'" <u>Elstad</u>, 470 U.S. at 309 (quoting <u>Michigan v. Tucker</u>, 417 U.S. 433, 446 (1974)).

[9]In this case, we have Det. Roland's very candid testimony about his mind-set at the time he began his interrogation of the Defendant. As recognized by the <u>Seibert</u> plurality, however, "the intent of the officer will rarely be . . . candidly admitted." <u>Seibert</u>, 542 U.S. at 616 n.6. Justice Kennedy's test becomes even more problematic in cases involving less candid testimony.

*VII. Tennessee Constitution*

The Tennessee Constitution also protects persons against compelled self-incrimination: "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. This Court has concluded that "the test of voluntariness for confessions under Article I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992) (citing State v. Smith, 834 S.W.2d 915 (Tenn. 1992)). Indeed, we have held that the

> extraction of an illegal, unwarned confession from a defendant raises a *rebuttable* presumption that a subsequent confession, even if preceded by proper Miranda warnings, is tainted by the initial illegality. That presumption may be overcome by the prosecution, however, if the State can establish "that the taint is so attenuated as to justify admission of the subsequent confession."

Smith, 834 S.W.2d at 919 (quoting Elstad, 470 U.S. at 335 (Brennan, J., dissenting)).

> In Smith, this Court determined that

> the crucial inquiry for the courts becomes whether the events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the State constitutional right not to provide evidence against one's self, and (2) voluntarily confessing his involvement in the crime.

Id. We then set forth a list of nine factors that courts should consider when examining the totality of the circumstances surrounding the two confessions in order to determine whether the second confession "can truly be termed a knowing and voluntary statement." Id. at 920. Those nine factors are:

> 1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;

> 2. The temporal proximity of the prior and subsequent confessions;

> 3. The reading and explanation of Miranda rights to the defendant before the subsequent confession;

> 4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;

> 5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity

17

of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;

6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;

7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;

8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered Miranda rights.

Id. at 919-20. The application of these factors in this case makes clear that the Defendant's postwarning confession was taken in violation of his Tennessee constitutional right against self-incrimination and cannot be used against him.

With respect to the first factor, we find that Det. Roland and Sgt. Postiglione used tactics designed to convince the Defendant that his refusal to confess would be to no avail because, they claimed, there was already enough evidence to convict him of first degree murder. The clear thrust of their prewarning interrogation was that the only way the Defendant could avoid a conviction of first degree murder was to confess. In the context of our analysis of this initial Smith factor, we find a strong causal connection between the officers' illegal prewarning interrogation and the Defendant's subsequent warned confession. Again, the officers employed tactics designed to convince the Defendant that his only hope of avoiding a first degree murder conviction was to confess. Since he was never told that his first confession was not admissible or that there was, in fact, no other evidence connecting him to the crime, the Defendant had no reason to believe that exercising his right against self-incrimination (once he was finally informed of that right) would be in any way meaningful.

The temporal proximity between the two confessions was very close. As soon as the Defendant told the officers what they wanted to know during his unwarned statement, the officers Mirandized him and then continued, without interruption, to solicit the second confession.

After the Defendant confessed to the officers' satisfaction, Det. Roland read the Defendant his rights, went over the waiver with him, and had the Defendant sign the waiver of rights form. The Defendant was not subjected to a prolonged detention between his first statement and his second statement, nor does it appear that he was deprived of food, rest, or bathroom facilities. The questioning took place at the police station, in a closed interview room, with two officers. Although the questioning was not prolonged, it was extremely focused, accusatory, and demanding. We have

already determined that the questioning was custodial. We recognized in Smith that "police custody is inherently coercive and compelling." Id. at 920.

There were no intervening factors such as consultations with counsel or family members between the first round of questioning and the second. The Defendant was never advised that his first confession would not be admissible at trial. The Defendant did not initiate the conversation that led to the second confession.

The Defendant appeared sober during the videotaped interview, although no questions as to his sobriety were asked. He denied ever having been read his Miranda rights before. The Defendant's education is unknown. The Defendant's intelligence appears within the normal range. The Defendant did not admit to any previous experience with the law.

Reviewing the totality of the circumstances surrounding the Defendant's two confessions, we hold that the State has failed to establish under Smith that the taint of the first illegal confession was so attenuated as to justify admission of the second confession. Indeed, the only attempt by the officers in this case to attenuate the second confession from the first confession was to inform the Defendant after his first confession that they had to "make it official," which included a recitation of his rights. Significantly, the Defendant was never informed that his "unofficial" confession would not be admissible against him. The psychological effect of having already confessed was therefore magnified. Combined with the officers' repeated claims that they already had the evidence to convict him of first degree murder, and that a confession was the means by which the Defendant might be entitled to a lesser charge, the Defendant had little hope of understanding, much less exercising, his right against self-incrimination by the time he was finally advised of it.

Accordingly, we hold that both of the Defendant's statements were taken in violation of his right against self-incrimination under the Tennessee Constitution. The trial court erred in failing to suppress both statements and the Court of Criminal Appeals erred in affirming the trial court.

## CONCLUSION

The victim in this case was the subject of a senseless murder. The delay in discovering the crime eliminated evidence and made solving the victim's murder extremely difficult. We laud the efforts of our law enforcement officers in seeking relevant information with which to solve the case and apprehend the perpetrator. As recognized by the United States Supreme Court, "[n]o mission of law enforcement officials is more important." Brewer v. Williams, 430 U.S. 387, 406 (1977). Unfortunately, however, "'[d]isinterested zeal for the public good does not assure either wisdom or right in the methods it pursues.'" Id. (quoting Haley v. Ohio, 332 U.S. 596, 605 (1948) (Frankfurter, J. concurring in judgment)).

We do not question the usefulness and efficacy of a law enforcement officer's "gut feelings and instincts" which were, in this case, very accurate. However, the interrogation techniques used by Det. Roland and Sgt. Postiglione in this matter cannot be employed during custodial interrogation unless prefaced by the warnings required by Miranda. We recognize that "[t]he pressures on state

19

executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder . . . ." Brewer, 430 U.S. at 406. We must also recognize, however, that "it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all." Id.

Unsolved crimes injure every member of our society. But so do unconstitutional actions by agents of our governments. The police officers' tactics in this case, though utilized with the best of intentions, violated the Defendant's federal and state constitutional rights against compelled self-incrimination. Those tactics force us to vacate the Defendant's conviction. Because the State has stipulated that the admissibility of the Defendant's confession is dispositive of the case and that, absent the Defendant's confession, it has no other evidence sufficient to support his conviction, we also must dismiss the charge against him. Needless to say, this result is deeply disturbing. Nevertheless, as observed by Mr. Justice Brandeis of the United States Supreme Court,

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting).

The judgment of the Court of Criminal Appeals is reversed, the Defendant's conviction is vacated, and the charge against the Defendant is dismissed. Costs of this cause are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE