# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 1, 2011

## STATE OF TENNESSEE v. KELLY WALKER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-04373     James M. Lammey, Jr., Judge**

---

**No. W2010-00122-CCA-R3-CD  - Filed May 17, 2011**

---

The defendant, Kelly Walker, was convicted by a Shelby County Criminal Court jury of facilitation of first degree premeditated murder, a Class A felony, and aggravated assault, a Class C felony.  He was sentenced as a Range I offender to twenty-five years and six years, respectively, to be served consecutively in the Tennessee Department of Correction.  On appeal, he argues that the trial court erred in denying his motion to suppress his statements and challenges the sufficiency of the evidence and the sentences imposed by the trial court. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, Kelly Walker.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and Pam Fleming, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant and a co-defendant, Cortez Johnson, were charged with the first degree premeditated murder of Marcus Glass and the aggravated assault of Cornelius Smith[1] as a

---

[1] Although there are two victims in this case, we will refer to Glass, the victim of the homicide, as
(continued...)

result of the co-defendant shooting into Glass's car at an intersection in Memphis during the early morning hours of January 28, 2008.

## Suppression Hearing

The trial court conducted a hearing on the defendant's motion to suppress his two statements. The State presented the testimony of Sergeant Vivian Murray with the Homicide Bureau of the Memphis Police Department who testified that she came into contact with the defendant at the police station on January 29, 2008, when she walked into the interview room in which he was sitting, and he recognized her as being the mother of one of his former classmates. The defendant informed Sergeant Murray that he wanted to speak with her and not the officers he was initially talking to, so, after checking with the other officers, she took Sergeant Mason into the interview room with her. She informed the defendant that she would have to advise him of his Miranda rights in order for him to talk to her, and he acknowledged that he understood those rights. Sergeant Murray interviewed the defendant and then took a formal statement from him. In his statement, the defendant denied having any involvement in the shooting in this case.

On cross-examination, Sergeant Murray elaborated that when she checked with the other officers prior to interviewing the defendant, they informed her that "[h]e was a suspect in that homicide and . . . it may have had something to do with his car" but did not tell her about any of the proof. The other officers also informed her that they had started talking to the defendant, but he decided that he did not want to talk to them anymore. Sergeant Murray acknowledged that when she read the defendant his rights, she knew that he was under arrest and was possibly going to be charged in connection with the complaint, but she did not know the details of the case to ascertain with what he was going to be charged. Sergeant Murray stated that the defendant was being detained for investigation but had not been placed in the jail on a forty-eight-hour hold. She recalled that later in the evening of his formal statement, the defendant was booked into the jail on a forty-eight-hour hold.

Sergeant Anthony Mullins with the Homicide Bureau of the Memphis Police Department testified that he came into contact with the defendant on January 29, 2008, when the defendant arrived at the police station on his own volition in response to Sergeant Mullins' call the previous day asking that "he come to the Homicide Office because his name had [been] brought up by someone else we interviewed." Sergeant Mullins elaborated that a suspect he had interviewed on January 28 had said that the defendant could verify "his alibi for where he was and when he was there."

---

[1](...continued)
"the victim," and Smith, the victim of the aggravated assault, as "Smith."

Sergeant Mullins testified that he interviewed the defendant for thirty to forty-five minutes and then went to locate the defendant's vehicle outside because the description the defendant gave of his vehicle "was very similar in description [to] that we were given by the surviving victim and witness." Once Sergeant Mullins located the defendant's vehicle, he took several photographs of it as well as of other vehicles nearby that were similar in color, shape, and other characteristics. Sergeant Mullins gave the photographs to Sergeant Davidson, the case coordinator, who showed them to the surviving witness to see if he could make an identification. The surviving witness selected the defendant's vehicle as one that looked like the car he had seen the night of the shooting. Sergeant Mullins explained that, at that point, the defendant changed from an alibi witness to a possible suspect, so he advised the defendant of his Miranda rights.

Sergeant Mullins testified that the defendant stated that he understood his rights and agreed to speak to the officers, but "in discussing the concerns that [the officers] had[,] [the defendant] indicated he didn't want to talk about it anymore." Sergeants Mullins and Mason left the interview room and went to find Sergeant Davidson to determine how to proceed. Sergeant Mullins recalled that, later, the defendant encountered Sergeant Murray and asked to speak with her. Thereafter, the defendant was placed on a forty-eight-hour investigative hold and put into the jail. The next day, Sergeant Mullins interviewed the co-defendant and the co-defendant's girlfriend and, armed with information obtained from them, interviewed the defendant again. Sergeant Mullins Mirandized the defendant, and the defendant agreed to give another statement. The new statement was substantially different than the one given to Sergeant Murray.

On cross-examination, Sergeant Mullins elaborated that during his initial thirty to forty-five-minute interview with the defendant, he asked the defendant whether he knew Cortez Johnson and what happened when he was with Johnson on Sunday night, January 27. It was also during that interview time that the defendant mentioned what kind of car he drove, which led to Sergeant Mullins' taking photographs of it. Sergeant Mullins said that up until that point, the defendant was not under arrest and could have left if he wanted to. Sergeant Mullins estimated that from the time it took him to take the photographs, the surviving victim to make an identification, and for him to return to the interview room, the defendant was alone in the interview room for approximately three hours. However, he said that he checked in on the defendant's well-being from time to time.

Sergeant Mullins reiterated that when he returned to the interview room after the surviving witness identified the defendant's car, he apprised the defendant of his Miranda rights before continuing the interview. However, when he confronted the defendant with his suspicion that the defendant was driving the car from which Johnson shot the victim, the defendant decided that he no longer wanted to talk to Sergeant Mullins, but the defendant

later gave a statement to Sergeant Murray. Sergeant Mullins said that the defendant was arrested on January 29 and placed on a forty-eight-hour hold.

Sergeant Mullins testified that the following day, January 30, the defendant was brought to the homicide office from the jail to be interviewed again because they had received inconsistent information from Cortez Johnson and Johnson's girlfriend. During the course of that interview, the defendant eventually gave information that varied from that given in his first statement, so Sergeant Mullins took a second statement from the defendant after again apprising him of his Miranda rights. Sergeant Mullins acknowledged that two different officers assisted in questioning the defendant during the interview and another officer assisted in the taking of the statement. Sergeant Mullins was not sure who initially Mirandized the defendant before the interview on January 30, but he "would not have interviewed [the defendant] after someone else had if he had not been Mirandized by them."

The defendant testified that he received a call from Sergeant Mullins the evening of January 28, asking him to come to the police station the following day for questioning concerning something that happened with Cortez Johnson. The defendant said that he went to the police station the following morning around 9:00 a.m. When he arrived, Sergeant Mullins was standing outside, so he escorted the defendant to the homicide office and into an interview room.

The defendant testified that a few minutes later, Sergeant Mullins entered the interview room and asked him general questions and questions about his relationship with Cortez Johnson. Sergeant Mullins did not tell him that Johnson had named him as an alibi witness and did not apprise the defendant of his Miranda rights. The defendant told Sergeant Mullins that he had taken Johnson to the club, McDonald's, and then home. Sergeant Mullins also asked the defendant what kind of car he drove. The defendant recalled that Sergeant Mullins took notes during the interview which lasted twenty to thirty minutes before Sergeant Mullins left without any explanation. The defendant elaborated that Sergeant Mullins did not tell him that he was going to take photographs of his car or tell him the purpose of asking what type of car he drove.

The defendant testified that while Sergeant Mullins was gone, Sergeant Murray looked into the interview room and the defendant recognized her, but she did not recognize him and left. About thirty to forty-five minutes later, Sergeant Mullins returned with photographs of his car. The defendant said that up until that point, he had been in the interview room for two or three hours, and he did not feel that he was free to leave. The defendant recalled that the first thing Sergeant Mullins did upon re-entering the room was slam a photograph of his car on the table and say that the witness had identified his car as the car the gunman was in. Sergeant Mullins had not advised him of his Miranda rights, told

him that he was investigating a homicide, informed him of the relevancy of the photographs, or told him that Johnson had named him as an alibi witness. Sergeant Mullins proceeded to "com[e] at" him with different questions and showed him photographs of a dead body for approximately an hour, all without apprising him of his Miranda rights. At some point, Sergeant Mason joined Sergeant Mullins in the interview room.

The defendant testified that after he kept telling the officers that he had nothing to do with the shooting, they showed him the advice of rights form to sign in order to talk to them. However, he told the officers that he did not want to talk and they left, but Sergeant Murray came in twenty to thirty minutes later with an advice of rights. The defendant explained that he had told Sergeant Murray that he wanted to talk to her when he saw her the first time.

The defendant testified that Sergeant Murray informed him that she could not talk to him unless he signed an advice of rights form, but she did not explain to him why he was being interviewed. He signed the advice of rights and they talked for "a pretty long time." Sergeant Murray then took the defendant's keys and cell phone, and he gave a statement. Afterwards, he was taken to the jail.

The defendant testified that the next day, January 30, Sergeant Mullins called him to the homicide office around noon. An officer put him in an interview room without saying anything to him, and Sergeants Mullins and Mason entered the room and talked to him about how someone said they had seen the defendant give Johnson a gun. However, the defendant did not tell the officers that he had given Johnson a gun on the Friday, saying instead that Johnson had gotten it out of his car. After Sergeants Mullins and Mason left, another officer entered the interview room and told the defendant that "he's not a regular detective, like he had more power than the other detectives." The officer told the defendant that he had "three strikes" and asked him questions "trying to make [him] give in." Neither Sergeants Mullins and Mason nor the other officer gave the defendant his Miranda rights.

The defendant testified that the other officer left and then returned with Sergeant Mullins. The defendant explained that was when he started "changing up [his] story" because he "wanted to be on [the officers'] side." Once the officers "got [the defendant] to say what [they] wanted [him] to say then they came in with another detective and a lady that typed the statement." The defendant could not recall whether he signed a consent to waive his rights prior to giving the statement. After giving the statement, he took the officers to his house to show them the gun that he had given Johnson on Friday night.

The trial court denied the defendant's motion to suppress his statements by written order filed May 4, 2009.

# Trial

## State's Proof

Lateisha Hawkins, the victim's sister, identified photographs of the victim and said that the last time she saw him alive was on January 27, 2008.

Cornelius Smith testified that the night of January 27, 2008, he was working at the Fire & Ice Nightclub in the Winchester Road and Kirby Parkway area of Memphis, taking up money in the parking lot. The victim was a good friend of his and also worked as a security guard inside the club. Smith recalled that on Friday, January 25, the victim and Cortez Johnson, "C-Lo," were involved in an altercation that ended with the victim putting Johnson in a "sleeper hold," rendering him unconscious. After Johnson was revived a few seconds later, he "got on the telephone and started making some phone calls." Johnson then went outside and got into a car that had just pulled up, and he was not allowed back in the club that night.

Smith testified that Johnson returned to the club on Sunday night, January 27, along with the defendant, who was driving a dark-colored, four-door car, possibly a Nissan Maxima, with tinted windows. Later, between 3:00 and 4:00 a.m., the victim agreed to give Smith and another man, Mack Gunn, a ride home from the club. After taking Gunn to his house, the victim and Smith were waiting at a traffic light to get on the 385 expressway. While the victim was talking on his cell phone, Smith noticed the car he had seen the defendant driving earlier approach the victim's car on the driver's side. Smith could not see the defendant in the car, but he saw Johnson on the passenger's side, "hanging out the window . . . with [a] gun hanging out pointing towards the car." Smith tried to grab the victim, but "it was too late. They was already firing shots." Smith ducked and prayed that he would not die. He heard fifteen to twenty gunshots, glass breaking, and bullets hitting the car.

Smith testified that when the shooting stopped and the car pulled away, he shook the victim and, realizing he was dead, put the car in park and called the police. Smith gave the police a description of the shooter's car and told them that Johnson was the shooter. Later that morning, Smith provided a statement to the officers at the police station. Sometime later, officers showed Smith a series of photographs of vehicles from which he identified one that looked similar to the car the shooter had been in. Smith said that there were street lights at the intersection where the shooting took place and that he was able to clearly see the car the shooter was in.

Lieutenant Donald Crowe with the Memphis Police Department testified that he responded to the scene of the shooting. Lieutenant Crowe stated that Cornelius Smith provided him with the shooter's nickname, and he took Smith to the police station where Smith gave a formal statement. Lieutenant Crowe identified several photographs of the crime scene.

Officer Alpha Hinds, a crime scene investigator with the Memphis Police Department, testified that she collected evidence at the scene as well as prepared a sketch and documented measurements.

Mack Gunn testified that he was working security at the Fire & Ice Nightclub the night of January 27 and early morning of January 28, 2008. Gunn was aware that the victim and Cortez Johnson had gotten into an argument two nights earlier that ended in the victim putting Johnson "in a choke hold [until] . . . [h]e fell asleep." Gunn recalled that Johnson was "furious" with the victim and "kept on saying he was going to get his ass." Johnson also said that "he had some heaters for the nigger's ass," which referred to guns. The morning of January 28, they closed the club a little after 4:00 a.m., and the victim agreed to take Gunn and Cornelius Smith home. The victim dropped Gunn off at his home and that was the last time Gunn saw the victim alive.

Ashley Butler, Cortez Johnson's girlfriend at the time of the incident, testified that she dropped Johnson off at the Fire & Ice Nightclub on Friday, January 25, 2008, around 8:00 or 9:00 p.m. He called her to pick him up from the club sometime between 2:00 and 3:00 a.m. the morning of January 26. When she arrived at the club, the club was closed and Johnson was not there. She went to a gas station, then returned to the club and continued to wait for Johnson. She saw the defendant's car outside the club and eventually Johnson exited and indicated for her to wait while he walked to the defendant's car. Johnson got into the defendant's car, then returned to the front of the club where he was angrily talking to some people. She noted that Johnson had his hands in his pockets, and she could see the end of a gun. Johnson then briefly returned to the defendant's car before he got into her car. Johnson no longer had the gun when he got into her car. Butler was aware that Johnson went to the club again two nights later; however, it was the defendant who took him that night, which was unusual because she normally drove him.

Sergeant Murray testified that she first came into contact with the defendant on January 29, 2008, when she walked into the interview room he was in and he recognized her as being the mother of one of his former classmates. The defendant specifically requested to talk to Sergeant Murray, so she explained to him his constitutional rights and took a formal statement from him.

In that statement, the defendant denied being responsible for the victim's death or knowing who was responsible. However, he acknowledged that Cortez Johnson may have wanted to harm the victim because of a dispute the two had earlier the week of the shooting. The defendant recalled that after Johnson's dispute with the victim, Johnson asked the defendant for a gun, but the defendant did not provide him one. Later that day, Johnson continued to ask the defendant about a gun, but the defendant told Johnson that he could not get one. The defendant said that the night of the shooting, he went with Johnson to the club, where they stayed until 2:30 a.m. and then went to a McDonald's near Johnson's grandmother's house. After staying at McDonald's for twenty to thirty minutes, the defendant dropped Johnson off at his grandmother's and went home. The defendant claimed to be unaware of Johnson's whereabouts around 4:30 a.m. and did not see or hear anything from him until around noon when he got a text message from Johnson saying, "'I got a fucked-up situation' . . . 'Call me ASAP.'" Around 6:30 that evening, Johnson asked the defendant to provide an alibi for him.

Officers Roger Wheeler and Ricky Davison, crime scene investigators with the Memphis Police Department, processed and collected evidence from the victim's vehicle. Fifteen bullet fragments were recovered from the car, and three of its four windows were shot out.

Sergeant Mullins testified that he first came into contact with the defendant after he interviewed Cortez Johnson and Johnson gave the defendant's name as one who could provide an alibi. During the course of being questioned as a witness, the defendant gave Sergeant Mullins a description of his car, which was "close enough to the description given by the surviving victim." Sergeant Mullins inquired where the defendant's car was parked and took photographs of it. He assisted in creating a photographic array of similar cars, which was then shown to Cornelius Smith who identified the defendant's car.

Sergeant Mullins testified that after the defendant's car was selected by the surviving victim, the defendant was advised of his rights and was questioned as a suspect by him and Sergeant Mason. When the officers started asking the defendant questions regarding the shooting, he said that he did not want to talk anymore, so the officers left the room to discuss how to proceed. Meanwhile, Sergeant Murray appeared, stating that the defendant wanted to speak with her, so Sergeants Murray and Mason conducted an interview of the defendant.

Sergeant Mullins testified that the defendant was ultimately placed on a forty-eight-hour hold in the jail; however, the next day, January 30, he was brought up for additional questioning. Sergeant Mullins was aware that the defendant had been Mirandized prior to speaking to him. In their conversation, the defendant admitted to Sergeant Mullins that he supplied an inoperable gun to Johnson the Friday night of the altercation between Johnson

and the victim and then told him what had happened on the night of the shooting. Sergeant Mullins then <u>Mirandized</u> the defendant again and took a formal statement from him.

In his statement, the defendant admitted that the statement he had given the previous day was not entirely truthful. He stated that Johnson was responsible for the victim's death. He admitted that he provided Johnson with a gun after Johnson's altercation with the victim at the club the Friday night before the shooting, but he explained that the gun was inoperable and he got it back from Johnson that night. The defendant stated that he talked to Johnson on Saturday, the day after the altercation, and Johnson again asked him for a gun, but the defendant did not provide one. The defendant stated that the following night, Sunday, he took Johnson to the club where they stayed until 2:45 a.m. when Johnson said he was ready to leave. The defendant continued:

> So we left the club and went to McDonald's in South Memphis. Left the McDonald's about 3:30 and then arrived at his grandma's house. I didn't see him go in, but he went on the side of the house and was like hold up, hold up I left something at Fire and Ice and then gave me a twenty. So on our way back to Fire and Ice he was saying I better not see this nigga and I was like who, but he mentioned no name. So as we arrived at Fire and Ice, [Johnson] was like there that Nigga go right there and I was like who and he said that nigga I got into it with Friday night. He said follow him and I was like for what and he was like just follow him bro. So we followed him for a short period of time. Then all of a sudden at the red light [Johnson] said stop, slow down right here and I was like for what. Then all of [a] sudden I heard several gunshots and sat there for a minute because I was in a shock to what was going on and drove off. Took [Johnson] to his grandma's house and on the way to his grandma's house he was like I told that nigga, I told that nigga I was going to get at him. Then I dropped him off and I went to the house.

In his statement, the defendant claimed that he did not realize Johnson had a gun until he started shooting. He said that Johnson contacted him later the day of the shooting and asked that he provide Johnson an alibi. The defendant concluded by telling the officers that his statement was given freely and voluntarily.

Special Agent Cervinia Braswell with the Firearms Identification Unit of the Tennessee Bureau of Investigation ("TBI") testified that she examined a High Point nine-millimeter pistol recovered in this case and determined that the gun was inoperable. She examined spent nine-millimeter cartridge casings recovered from the victim's car and determined that they were all fired from the same gun, but not the High Point nine-millimeter. She also examined several nine-millimeter bullets and fragments as well as two

forty-one caliber bullets recovered from the victim's car. Special Agent Braswell determined that the nine-millimeter bullets and fragments could have been fired from the same gun, but not the High Point pistol. With regard to the forty-one caliber bullets, Special Agent Braswell noted that the gun that fired that type of bullet was a revolver, therefore, it was not unusual to not find cartridge casings because casings remain in the cylinder of a revolver.

Dr. Marco Ross with the Shelby County Medical Examiner's Office testified that he reviewed the records from the victim's autopsy, which revealed that the victim suffered nine gunshot wounds.

### Defendant's Proof

Marline Walker, the defendant's mother, testified that she woke up around 4:00 a.m. on January 28, 2008, because she had to take one of her other sons to the airport. When she walked downstairs, she noticed that the defendant was asleep on the couch. However, she did not know what time the defendant had gotten home.

The defendant testified that he met Cortez Johnson a few months prior to the shooting, and they became friends. Johnson was an event promoter for Fire & Ice Nightclub. The defendant recalled that Johnson called him around 3:00 a.m. the morning of January 26, 2008, because he had gotten into an argument with the victim, a security guard at the club, and wanted a gun. The defendant assumed that Johnson only wanted to scare someone, so he took his gun, which he kept under his car seat for protection, and met Johnson at the club. When the defendant arrived, Johnson got into the defendant's car and "really didn't saying nothing. He just said, 'Give me the strap.'" The defendant knew that his gun did not work, so he "just gave it to him." Johnson got out of the car and walked around like he was waiting on someone to come out of the club but then got back into the defendant's car and returned the gun. Johnson then got into a car with his girlfriend.

The defendant testified that he talked to Johnson on Saturday, and he was again inquiring about a gun. The defendant knew that his gun was inoperable, so he told Johnson, "I'll se what I can do for you." The defendant said that he next talked to Johnson the following day when Johnson called to see if the defendant was going to the club. The defendant picked Johnson up at his grandmother's house around 11:00 p.m., and the two went to the club. At some point, Johnson asked for the defendant's car keys so he could get flyers for his next event out of the defendant's car. Later, around 2:00 or 2:30 a.m., the defendant and Johnson decided to leave the club. After stopping at a McDonald's, the defendant took Johnson to his grandmother's house around 3:00 or 3:30 a.m. and then went home and fell asleep on the couch.

The defendant testified that after he arrived home from work that Monday evening, a police officer called and asked him to come to the police station for questioning the following day. The defendant drove his four-door, metallic silver Honda to the police station at 10:00 a.m. and met Sergeant Mullins who informed him that he was there for questioning and placed him in a room by himself. The defendant recalled that Sergeant Mullins came into the room and talked to him, then asked for his car keys and phone. However, Sergeant Mullins never explained why he wanted to talk to the defendant or wanted his keys and phone. The defendant told Sergeant Mullins where he had parked, and the defendant was left in the room by himself.

The defendant testified that Sergeant Mullins, along with another officer, returned fifteen to twenty minutes later with photographs of the defendant's car. Sergeant Mullins informed him that there had been a shooting and that a witness had identified his car. When the defendant questioned what Sergeant Mullins was talking about, the sergeant "slammed the papers down" and eventually said something about Cortez Johnson, whom the defendant admitted knowing. Sergeant Mullins then began "slamming pictures down" of a dead body and other things, but the defendant denied any involvement. The officers questioned him for forty-five minutes to an hour and asked about his relationship with Johnson, but the defendant had no idea the officers were talking about a homicide. He was only told that Johnson was seen shooting out of a car that looked like the defendant's car. After the interview, the officers showed him a piece of paper of his Miranda rights and asked if he wanted to keep talking to them, but the defendant declined and the officers left. The officers did not tell him that he could leave, and he was not handcuffed to the chair.

The defendant testified that while he was sitting in the room, he saw Sergeant Murray, the mother of one of his former classmates. The defendant asked Sergeant Murray if he could talk to her, and she returned to the room with another officer. The defendant had a conversation with Sergeant Murray and then gave her a formal statement an hour or two later in which he denied any involvement in the shooting.

The defendant stated that he was interviewed again the next day by Sergeant Mullins and another officer. The officers told the defendant that they had learned that the defendant had given Johnson the gun to shoot the victim, but the defendant told them that his gun was inoperable. The defendant maintained that a transcriptionist was not present during this interview, and the officers kept trying to get him to admit he was involved. The defendant eventually admitted to the officers that he had given Johnson a gun on Friday night. The officers repeatedly told the defendant that he was "gonna get fifty years" and, in essence, badgered him until he was so scared that he made up a story based on pieces of information the officers had relayed to him. That story ended up being his second formal statement. Afterwards, he took the officers to locate his inoperable gun.

-11-

After the conclusion of the proof, the jury convicted the defendant of facilitation of first degree murder as included in count one of the indictment and aggravated assault as charged in the second count of the indictment.

## ANALYSIS

### I. Motion to Suppress

The defendant first argues that the trial court erred in denying his motion to suppress his two statements to the police. When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Our supreme court has held that an individual is "in custody" if

under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. The test is objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question.

State v. Anderson, 937 S.W.2d 851, 852 (Tenn. 1996). The Anderson court outlined a non-exhaustive list of factors for the trial court to consider in evaluating whether the totality of the circumstances indicated that a defendant was in custody for purposes of Miranda. The factors include

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855 (citations omitted); see State v. Dailey, 273 S.W.3d 94, 102 (Tenn. 2009).

On appeal, the defendant argues that his first statement should have been suppressed pursuant to Dailey because he was not given his Miranda rights when he first arrived at the police station for questioning. The record contains no memorandum of law in support of his motion to suppress and the motion itself makes no legal citations to authority in support of his assertions therein. However, at the hearing on the motion, as we understand his argument, the defendant asserted that Dailey necessitated suppression of his first statement because he was called to the police station as a ruse to get him to confess to the crime and therefore he should have been given his Miranda rights immediately.

In its denial of the defendant's motion to suppress, with regard to the defendant's first statement, the trial court found that there was no proof that the defendant was asked to come to the police station as a ruse to get him to confess to the crime but, instead, was asked to come to the police station to check the co-defendant's alibi. The court determined that the defendant did not become a suspect until after a photograph of his car was identified by the surviving victim and that the defendant was "immediately advised of his rights before any accusatory questioning began."

We conclude that the evidence does not preponderate against the trial court's finding that the defendant was properly advised of his Miranda rights after he became a suspect and before any accusatorial questioning. In the light most favorable to the State, the evidence shows that the defendant was originally asked to come to the police station because his name

had come up as a possible witness for Cortez Johnson, and he transported himself to the police station on his own volition. During his conversation with the officers, the defendant admitted that he had been with Johnson on the night in question, in the same car he had driven to the police station that day. Sergeant Mullins took photographs of the defendant's car, and an array of vehicles was shown to the surviving victim from which the victim identified the defendant's car as the car from which Johnson fired the shots. At that point, the defendant became a suspect, rather than a witness, in the officers' eyes, and the defendant was apprised of his Miranda rights. The defendant ceased his conversation with the officers but later asked to speak to Sergeant Murray, who informed him of his constitutional rights and took his statement. The trial court did not err in denying the suppression of the defendant's first statement.

As we understand his second argument, the defendant asserts that his second statement was subject to suppression under State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), because the officers already had probable cause to arrest him and only waited to do so in an attempt to secure an incriminating statement, making his statement the product of an illegal detention. We respectfully disagree with the defendant's assertion. The situation faced by the court in Huddleston is clearly distinguishable from the case at hand. The defendant in Huddleston was arrested without a warrant on a Friday afternoon and held without a judicial determination of probable cause before issuing a confession, preceded by Miranda warnings and a signed waiver of rights, on the following Monday afternoon. Id. at 668. The next day, relying solely on the defendant's confession, a police detective obtained a probable cause warrant from a magistrate. Id. Because the defendant was held more than seventy-two hours without a judicial determination of probable cause and the State failed to justify the delay, the Huddleston court found that the defendant's Fourth Amendment rights were violated. Id. at 675.

In denying suppression of the defendant's second statement, the trial court observed that the judicial commissioner determined that there was justification to hold the defendant for further investigation and that there was no "unduly lengthy delay." The court noted that, the next day, the defendant was questioned again and, after being apprised of his rights, gave a voluntary statement to the police. A judicial determination of probable cause that occurs within forty-eight hours of a defendant's arrest is generally sufficient to satisfy the Fourth Amendment, unless there is evidence that the probable cause determination was unreasonably delayed for the purpose of gathering additional information to justify an arrest, was motivated by ill will toward the defendant, or constituted a "'delay for delay's sake.'" Id. at 672 (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991)). "[I]f the statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." Id. at 675. The facts of the case at hand simply do not preponderate against the trial court's finding that the

-14-

defendant was not illegally detained.  Thus, the trial court did not err in denying suppression of the defendant's second statement.

## II. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to sustain his convictions. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).  Facilitation is established by proof that the accused knew

another person intended to commit a specific felony and knowingly furnished substantial assistance in the commission of the felony. Id. § 39-11-403(a). An aggravated assault is committed when a person intentionally or knowingly commits an assault as defined in section 39-13-101 and uses or displays a deadly weapon. Id. § 39-13-102(a)(1)(B). A person commits an assault who intentionally or knowingly causes another to reasonably fear imminent bodily injury. Id. §§ 39-13-101(a)(2); -102(a)(1)(B).

On appeal, the defendant does not challenge that the offenses of facilitation of first degree murder and aggravated assault occurred. He only challenges his involvement in the attack on the victims, arguing that he was not with Cortez Johnson at the time of the shooting. However, in the light most favorable to the State, the evidence shows that the surviving victim, Cornelius Smith, identified the defendant's car as the car from which Johnson fired the multiple gunshots. In a statement to police given on January 30, 2008, the defendant admitted that he was driving the car when Johnson directed him to follow the victim's car and subsequently fired on it. The defendant asserts that his mother's testimony that he was at home at 4:00 a.m. was "entirely credible and believable" and proved that he was not with Johnson at the time of the shooting. However, the precise time of the shooting was unclear at trial, and it was suggested that the defendant could have potentially made it home to be observed by his mother even after being involved in the shooting. In any event, the credibility of the witnesses was before the jury, and the jury accredited the testimonies of the State's witnesses, as was its province. We conclude that a rational trier of fact could have found the defendant guilty of facilitation of first degree murder and aggravated assault.

## III. Sentencing

After a sentencing hearing, the trial court imposed consecutive sentences of twenty-five years for the facilitation of first degree murder conviction and six years for the aggravated assault conviction. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2010). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

In determining the defendant's sentences, the court applied as an enhancement factor to both convictions that the defendant was a leader in the commission of the offense, see Tenn. Code Ann. § 40-35-114(2), in that he "could have seen what was about to happen . . . [and] done any number of things" to stop it, but instead "provided a gun . . . [and] egged on Mr. Johnson." The court applied as an enhancement factor to the aggravated assault conviction that the defendant allowed the victim to be treated with exceptional cruelty, see id. § 40-35-114(5). The court applied as an enhancement factor to the facilitation of first degree murder conviction that the defendant possessed or employed a firearm during the commission of the offense, see id. § 40-35-114(9).

With regard to possible mitigating factors argued by the defendant, the trial court declined to apply as mitigation that the defendant was not a gang member, noting that "most people are not gang members." The court acknowledged that the defendant had no criminal record and had obtained a high school diploma and attended some college, but determined not to use those factors as mitigation because "[h]e should have known better."

The defendant argues that the trial court failed to consider as mitigation that he did not have any prior criminal record and was enrolled in college and "a student of good standing" at the time of the incident. However, the record shows that the trial court listened to the defendant's argument and considered the defendant's history, but essentially

determined that the factors were entitled to no weight because he was educated and "raised in a situation that was [not] conducive to this type of behavior." This determination was in the trial court's sound discretion.

The defendant also challenges the trial court's imposition of consecutive sentences, arguing that such was inappropriate because "[o]bviously the jury felt that the defendant was involved but not to the degree as alleged by the State." As relevant here, Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds by a preponderance of the evidence that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. Id. § 40-35-115(b)(4). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

In ordering consecutive sentencing, the trial court observed that anyone "who would go hunt down someone for purposes of hunting them down" satisfied the definition of a dangerous offender and that the circumstances were aggravated in that the defendant willingly drove Cortez Johnson around and stopped so Johnson could fire over twenty shots at the victim. The court also determined that the aggregate length of the sentences related to the severity of the offenses and that the public would question why someone committing an offense surrounded by such aggravated circumstances would get concurrent sentences. The record shows that the trial court considered the appropriate sentencing principles and all relevant facts and circumstances, and the record supports the sentences imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE