IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2011

## STATE OF TENNESSEE v. JOHN C. CRIM

### Direct Appeal from the Criminal Court for Wilson County
No. 08-CR-567    David Earl Durham, Judge

_____

### No. M2010-01281-CCA-R3-CD -Filed January 10, 2012

_____

A jury convicted the Defendant-Appellant, John C. Crim, of eight counts of rape of a child, Class A felonies, and six counts of aggravated sexual battery of a child less than thirteen years old, Class B felonies. The trial court sentenced him to an effective 212-year sentence in the Tennessee Department of Correction. On appeal, the defendant argues that (1) the trial court erred in denying his motion to suppress; (2) the evidence was insufficient to support his convictions; and (3) his sentence is excessive. Upon our review, we affirm the denial of the motion to suppress and the judgments of conviction. We further agree with the state that the matter should be remanded for a new sentencing hearing.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Gregory D. Smith, Lead Counsel, Clarksville, Tennessee; Comer L. Donnell, District Public Defender; Marie Farley and William Cather, Assistant Public Defenders, Lebanon, Tennessee, for the Defendant-Appellant, John C. Crim.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Thomas H. Swink, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

This case involves the rape of H.F.[1], the minor victim. H.F. reported that Crim, who is her father, had sexually abused her. As part of their investigation, the police interviewed Crim, who admitted to the inappropriate sexual contact while unknowingly being recorded by the police.

On May 8, 2009, Crim filed a motion to suppress his statements to police. Crim argued that detectives did not advise him of his rights, and thus, his statement violated his right against self-incrimination. Detective Brian Harbaugh, with the Wilson County Sheriff's Office, testified at the suppression hearing that on May 21, 2008, Child and Youth Services (CYS) notified his office that they had received a complaint that mentioned H.F. as the victim. CYS had interviewed H.F., and she had identified Crim as the person who had sexually assaulted her.

Detective Harbaugh initiated his investigation by completing the necessary paperwork and speaking with H.F. and her mother. Detective Harbaugh then called Crim and explained to him that his name had come up during the investigation and asked Crim to come to his office when he had time. They agreed to meet on May 27, 2008, at 1:00 p.m.

Crim arrived at the sheriff's office at the agreed upon time. Detective Harbaugh met him in the lobby, introduced himself, and walked Crim to the interview room. Detective Harbaugh and Crim walked through a set of double steel doors that locked such that nobody could go in them, but anyone inside could exit them freely. Once in the interview room, Detective Stafford joined them. Detective Harbaugh stated that neither he nor Detective Stafford blocked the door to the interview room preventing Crim from leaving and that Crim "had a straight shot from his chair to the door."

During the interview, Detective Harbaugh and Detective Stafford were dressed in civilian clothing. They each had their firearms on the right side of their hips and their badges in front of them. Detective Harbaugh stated that he did not search Crim before bringing him to the interview room. Detective Harbaugh had turned on a tape recorder before he walked to the lobby to get Crim. He said that he did not videotape the interview because the sheriff's office did not have the capability. When they began the interview, Detective Harbaugh explained to Crim that he was not in custody or under arrest and could voluntarily leave anytime. He further explained to Crim that his name had come up during the investigation of H.F.'s sexual assault, and he wanted to question him. Detective Harbaugh asked Crim if he understood that they were not holding him, and Crim said that he understood. According to Detective Harbaugh, Crim did not show any signs of being under the influence of drugs or alcohol. He said that Crim "appeared to be alert and did not give any signs of being

[1]It is the policy of this court to refer to a minor victim of sexual abuse by his or her initials.

impaired in any way." The door to the interview room was open while the detectives interviewed Crim. After the interview, Detective Harbaugh walked Crim to the front entrance of the sheriff's office. The state played the tape recorded interview for the court.

On cross-examination, Detective Harbaugh testified that he did not have probable cause to arrest Crim at the time he called him for the interview. He stated that he and Crim walked down three hallways before reaching the interview room. According to Detective Harbaugh, all of the doors to the hallways as well as the door to the interview room were open. He stated that while in the interview room, Crim sat with his back to a window which was opposite the door. Detective Harbaugh and Detective Stafford sat with their backs toward the door, but Detective Harbaugh said that Crim could "literally walk a straight beeline to the door."

Detective Harbaugh did not tell Crim that he was recording him because, to his knowledge, he did not have to tell him. He further stated that "most people, if they know you're recording they tend to be more closed, not open for conversation. It makes them apprehensive." Detective Harbaugh said that he intended to present Crim's statements to the district attorney for use during the prosecution of Crim. He did not ask Crim if he was intoxicated or had been using any kind of drug because he did not have any reason to do so. Detective Harbaugh recalled repeatedly assuring Crim that "what was said in that room would stay in that room[.]" He recalled telling Crim that he had a lab examine DNA found on H.F.'s clothing. He stated that he told Crim that a lab was testing the DNA to imply that the detectives knew more about what happened than they really knew. He told Crim that they interviewed doctors, counselors, and other witnesses. Detective Harbaugh said that the only evidence that he had when he interviewed Crim was the phone conversation that he had with H.F., H.F.'s mother, and the CYS worker.

Detective Harbaugh stated that he intended to help Crim by having him incarcerated, but did not think that Crim would agree, so he did not go into details about what type of help he wanted to give him. Detective Harbaugh stated that in his opinion, Crim's being in jail where he could not touch little girls was "working out" the situation. He wanted Crim to be as comfortable as possible during the interview, and he wanted Crim to give a truthful and factual statement.

In denying the motion, the trial court found that, considering the "time and location of interrogation, the duration, character of the questioning, the method of transportation, etcetera," Crim's interview was not a custodial interview. Specifically, the court found that (1) Crim went to the sheriff's office voluntarily; (2) nothing was intimidating about how the detectives were dressed; (3) Detective Harbaugh told the defendant that he was not in custody and free to leave, (4) Crim was not under the influence of drugs or suffering from

-3-

any condition, (5) the conversation was not confrontational, and (6) Crim freely volunteered information. Furthermore, the trial court found that Detective Harbaugh's statement that what they said during the interview would stay there was regarding what Crim's family would find out about what happened.

**Trial.** On November 30 and December 1, 2009, the trial court held a jury trial for Crim's case at which the parties presented the following evidence.

H.F's mother testified that Crim is H.F.'s father. H.F. was fourteen years old at the time of trial. H. F.'s mother stated that she and Crim ended their relationship after she became pregnant with H.F. H. F.'s mother lived in Wilson County, Tennessee until she moved to Virginia when H.F. was ten months old. While living in Virginia, H. F.'s mother had hardly any contact with Crim.

When H.F. was six years old, the child support office found Crim, did a DNA test, and determined that he was H.F.'s father. After establishing that Crim was H.F.'s father, the court ordered that Crim could visit with H.F. every other holiday and for a month in the summer. Crim lived in Wilson County, Tennessee, and H. F.'s mother stated that because she and Crim lived so far apart, Crim only exercised his visitation rights by having H.F. visit him during the summer. H.F. visited Crim the Christmas of 2004 and the summers of 2005 through 2007. H. F.'s mother did not allow H.F. to visit Crim the summer of 2008 because H.F. made allegations against Crim. H.F. turned thirteen years old on September 20, 2008, and was less than thirteen years old each time that she had visited Crim. After H.F. made the allegations against Crim, H. F.'s mother took her to the CYS office.

On cross-examination, H. F.'s mother testified that the department of human services was investigating her when H.F. made the allegations against Crim. H. F.'s mother denied that H.F. was "thinking about and facing the possibility of being removed from [her] home and separated from her siblings." H. F.'s mother stated that she did not know what the case worker had written in her report. She stated that Crim possibly would have gotten custody of H.F. if authorities removed H.F. from her home. Her other children would not have been placed in Crim's custody, which meant that H.F. would have been separated from her siblings.

Before the paternity test when H.F. was six years old, H. F.'s mother had talked to H.F. about her father, and H.F. knew who he was. H. F.'s mother denied that she called Crim names in front of H.F. after the allegations. She said that it was possible that she called Crim a monster and a "sick bastard" but not while in the presence of H.F. H. F.'s mother denied implanting negative thoughts about Crim into H.F.'s mind.

-4-

H.F. testified that she was fourteen years old. She lived in Pennsylvania with her mother and sisters and said that Crim was her father. H.F. began visiting her father during the summers when she was six years old. While she visited him, Crim had lived at several different addresses.

H.F. recalled visiting Crim when he lived on Carthage Highway. She also recalled that Crim had touched her inappropriately when she visited him there in 2004. H.F. testified she and her father were coming from her aunt's house when Crim first touched her inappropriately. She said that she "was halfway asleep and [Crim] started rubbing [her] private with his hand[.]"

H.F. recalled another incident when Crim touched her inappropriately. She said that she was sleeping and got frightened because of a thunderstorm. She went into Crim's room and fell asleep in his bed. She had been dreaming about an earthquake when she woke up and "realized [that] it was pain. [Crim] was trying to stick his private into [hers], and . . . it didn't work, so . . . he stopped and went out to get coffee." H.F. said that when she felt the pain around her private area, she just laid there and pretended to be asleep because she did not know what else to do. She stated that before Crim went to get his coffee, he pulled her up underwear. H.F. and Crim never discussed that occurrence.

H.F. testified that one day she wanted to go swimming, and Crim told her that she had to perform oral sex on him if she really wanted to go swimming. H.F. went into Crim's room, and he told her to undress. Crim got undressed, laid on his back on the bed, and told H.F. to "get between his legs and give him a blow job." H.F. said that she did so by putting her mouth on his "private" for about five minutes. She continued to perform oral sex on Crim until he told her to stop. She said that sperm came out of Crim's penis and got on his stomach. She testified that Crim had her perform oral sex on him two additional times besides this incident. She said that sperm came out both times.

H.F. further stated that one morning Crim was using the computer at his home, and H.F. asked if she could play on the computer. He told her that he was doing something on the computer and asked her to sit in his lap. H.F. sat in Crim's lap, and Crim showed her people having sex on the computer screen. He asked H.F. if she could do what the woman on the computer screen was doing, and H.F. said no. Crim told H.F. that she could do it if she tried, but H.F. said that she could not and tried to get away from Crim. Crim pulled her back onto his lap, but did not touch her inappropriately.

On another day, Crim told H.F. that he wanted to have sex, but H.F. did not want to have sex. Crim told her to go into his room, get undressed, and lay on his bed. H.F. did what Crim told her, and he came in, got undressed, and "started rubbing his private against [hers]."

H.F. said that Crim put his penis inside the "opening" of her vagina. H.F. explained that she was lying on her back, and Crim was on top of her. She said that he was on top of her for ten to fifteen minutes. H.F. stated that Crim's sperm got on her buttocks. Crim cleaned the sperm off his bed, but H.F. cleaned it off herself with a rag that Crim kept at his bedside.

H.F. testified that Crim rubbed "his private inside [her] private . . . just about two times every visit." She elaborated that "she felt his private on both sides of the inside of [her] private." However, she stated that it was not all the way inside her vagina. H.F. said that once, Crim "wanted [her] to get on [her] hands and knees, so [she] did, and he got behind [her] and started rubbing his private against [hers] and told [her] to look down, and [she] did, and [she] saw the sperm on the wash rag[.]" She said that Crim had done this to her one other time, but he did not tell her to look down the second time.

H.F. said that one summer Crim had performed oral sex on her by putting her legs over his shoulders and "licking [her] private." She said that he was not wearing any clothing and she was not wearing a shirt. This went on for about five minutes. H.F. stated that Crim performed oral sex on her a second time during a different summer. She remembered that she had a different shirt the second time he performed oral sex on her.

H.F. could not remember how often she had visited Crim. H.F. stopped visiting Crim after she found out she was supposed to spend a whole summer with him. She stated that she no longer wanted to deal with Crim's inappropriate touching so she told her mother what he had been doing to her.

On cross-examination, H.F. testified that around May 2008, she was afraid that a case worker might take her away from her mother and siblings. She spoke with the case worker about the possibility of being taken away from her family. H.F. said that she talked to prosecutors and counselors about testifying at trial, but denied that anyone told her to say things a certain way. She denied that her father lived in Livingston, Tennessee during the thunderstorm and swimming incidents.

Detective Brian Harbaugh, with the Wilson County Sheriff's Office, testified consistently with his motion to suppress testimony. While playing the recording of Crim's interview to the jury, it ended abruptly because the tape recorder ran out of time to record. According to Detective Harbaugh, after the recording ended the detectives made sure that Crim understood that he should return their calls if they needed to speak with him again. Crim asked where he could travel, and the detectives advised him that he could travel wherever he wanted. Detective Harbaugh walked Crim back to the lobby after the interview and Crim left the building. Detective Harbaugh stated that the Crim appeared to be coherent and did not appear to be under the influence of an intoxicant.

In the beginning of the interview, Crim denied the allegations and said someone must have told H.F. to make them. Detective Harbaugh said that he continued to question Crim after he denied the allegations because he initially was "feeling [Crim] out . . . to see what kind of person he [was] and to see how he respond[ed]." He said that he used people's reactions to gauge whether he believed they were responsible. Detective Harbaugh recalled that Crim responded that he had touched H.F. "a few times each year from the time she was seven[.]" Detective Harbaugh stated that he pushed Crim to be truthful and they went through each incident from the time H.F. was seven years old. Crim told Harbaugh that he had penile to vaginal contact with H.F. nine to twelve times, that she performed oral sex on him four or five times, and that he performed oral sex on her once. Detective Harbaugh testified that Crim told him that "[h]e had every intention of coming in and trying to convince [Detective Harbaugh] that [he] did not do anything."

On cross-examination, Detective Harbaugh admitted telling Crim that he knew what happened. He could not recall whether he told Crim that if he was honest during the interview the consequence would be counseling, but stated that he knew the likely consequence was incarceration. Detective Harbaugh also admitted that he wanted Crim to be honest during the interview although he was not completely honest himself.

After hearing the evidence, the jury convicted Crim of eight counts of rape of child and six counts of aggravated sexual battery of a child less than thirteen years old.

At the sentencing hearing, Steven Branson, a Board of Probation and Parole Officer, testified that he prepared Crim's presentence report, which contained a 1987 possession of marijuana conviction and a victim impact statement from H. F.'s mother.

Larry Locke testified that he met Crim while he was involved in Bible study and worship services at the Wilson County Jail. He observed Crim to have "a good demeanor and outward appearance" in addition to "a lot of knowledge of scripture of the Bible . . . ." He said that Crim had positive interactions at their Bible studies and with the other inmates. Locke thought that Crim was a good man who did some bad things for which Crim genuinely felt sorry and regretful.

In an oral statement to the court, Crim expressed his faith in God and concern for H.F. Crim said that other inmates usually kill inmates with convictions such as his, and he did not want H.F. to feel guilty for testifying against him. Crim asked the trial judge to allow him to reconcile with H.F. and "be a real godly daddy to a hurting and anguished young girl."

The trial court sentenced the defendant to twenty-five years at 100% for each rape of a child conviction and twelve years at 100% for each aggravated sexual battery of child less than thirteen years old conviction. The court ordered Crim to serve the rape of the child sentences consecutively to one another and one sentence for aggravated sexual battery of a child less than thirteen. The court ordered Crim to serve the remaining charges concurrently for a total effective sentence of 212 years. After the trial court's denial of his motion for a new trial, Crim timely appealed his convictions and sentences.

## ANALYSIS

**I. Motion to Suppress**. Crim argues that his "non-custodial statement should have been suppressed because the state did not give [him] Miranda warnings[,] and [he] was in police custody . . . ." The State replies that the trial court properly admitted Crim's statement because he was not in custody when he gave his statement to the police. We agree with the State.

The standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. The courts of this state have concluded that "a trial court's determination at a suppression hearing is presumptively correct on appeal." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (citing State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986)).

Police officers are only obligated to administer Miranda warnings before "custodial interrogation." See Miranda v. Arizona, 384 U.S. 436, 444 (1966). Whether a person is in custody requires an inquiry into "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of

-8-

freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996).

Initially, we note that in ruling on the motion to suppress, the trial court heavily relied on Crim's tape recorded interview, which is not contained in the record on appeal. It is the burden of the appellant to prepare a full and complete record for appellate review. Tenn. R. App. P. 24(b). Despite the omission of the tape recording, the record supports the trial court's ruling on the motion to suppress. In making its ruling, the trial court cited Anderson, in which our supreme court stated that a person's objective view of whether he or she is under arrest for Miranda purposes must be assessed by the totality of the circumstances. The trial court also compared Crim's case to State v. Dailey, 273 S.W.3d 94, 104 (Tenn. 2009), in which our supreme court noted that "the inquiry focuses on what a reasonable person in the Defendant's position would have concluded from the circumstances in which he found himself, not what the Defendant may actually have been thinking at the time."

The trial court noted that Detective Harbaugh already had the victim's statement that named Crim as the person who had assaulted her. Detective Harbaugh told Crim that he wanted to speak with him about the accusations, and Crim voluntarily drove himself to the sheriff's office to discuss accusations. Crim was able to schedule a day and time to speak with officers that was convenient for his schedule. The trial court found that a reasonable man would have known that

> he was going to be questioned about allegations his daughter had made or a criminal nature, had plenty of time to call a lawyer if he wanted to do that, had plenty of time to change his mind and not come in if he wanted to do that, but he didn't. [Crim] showed up voluntarily and walked in that Sheriff's Department voluntarily.

The court noted that the officers were in "street clothes" which were not intimidating attire. The court found that Detective Harbaugh told Crim before the interview that he was not in custody and was free to leave anytime. The court found that the "entire interview during the first portion was conversational, not confrontational," and Crim volunteered information without the detectives asking him to do so.

Regarding Crim's claims that Detective Harbaugh was not forthcoming, the trial court found that Detective Harbaugh told Crim about the evidence that they did not have and that Crim knew there was no DNA or semen. The trial court further found that, based on the context of the conversation, when Detective Harbaugh stated "what we talk about here stays here," he was referring to not sharing the information with Crim's family. The trial court

noted that the tape ended after one hour and twenty-one minutes, which "was not particularly long."

The court distinguished Crim's case from Dailey and found that the Anderson factors suggested that it was not a custodial interview. Thus, the trial court denied Crim's motion to suppress. Upon our review, the evidence does not preponderate against the findings of the trial court. Accordingly, we conclude that the trial court did not err in ruling that Crim's statements were admissible at trial.

**II. Sufficiency of the Evidence.** On appeal, Crim argues that the evidence is insufficient to sustain his conviction.[2] Here, Crim asserts that the jury was unable to reach a unanimous verdict because "there [were] only nebulous references to some summer between 2004 and 2007" in the multiple count indictment. Crim insists that all of his convictions, except for the Christmas 2004 count, must be overturned because "the State did not meet the mandate of proving a unanimous jury verdict." The State responds that the evidence is sufficient to support the verdicts and that its election of offenses and the trial court's instruction regarding a unanimous jury verdict assured that the jury reached a unanimous verdict.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in cases where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The Tennessee Supreme Court has adopted the United States Supreme Court standard that direct and circumstantial evidence should be treated the same when reviewing the sufficiency of the evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23 (Tenn. 1996).

---

[2]Crim does not identify which convictions he contends are not sufficiently supported by the proof in his brief.

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

When an indictment charges that a number of sexual offenses occurred over a span of time, the State may introduce evidence of any unlawful sexual activity between the defendant and the victim allegedly occurring during that span of time. State v. Rickman, 876 S.W.2d 824, 828–829 (Tenn. 1994). However, at the conclusion of its case-in-chief, the State must elect the particular incident for which a conviction is being sought. See Burlison v. State, 501 S.W.2d 801, 803 (Tenn. 1973); see also Johnson, 53 S.W.3d at 630.

In this regard, the Tennessee Supreme Court has held:

[W]hen the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought. This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense. This right to a unanimous verdict has been characterized by this Court as fundamental, immediately touching on the constitutional rights of an accused . . . .

Adams, 24 S.W.3d at 294 (internal citations and quotations omitted). In addition, "[w]here the State presents evidence of numerous offenses, the trial court must augment the general jury unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts." State v. Hodge, 989 S.W.2d 717, 721 (Tenn. Crim. App. 1998). The State must "elect the specific offense upon which a verdict of guilty would be demanded." State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993) (citing Burlison, 501

-11-

S.W.2d at 803). Failure to issue a jury instruction on election to insure unanimity constitutes reversible error. Id.

Our supreme court has acknowledged the practical difficulties present in applying the election requirement in cases of child sexual abuse, and has provided that "the state is not required to identify the particular date of the chosen offense. . . . [A] particular offense can often be identified without a date." Shelton, 851 S.W.2d at 137; see Brown, 992 S.W.2d at 392 (providing that "[t]he State is not required to prove that an offense was committed on a specific date unless the date is an element of the crime or essential to proving the offense."). As the court explained,

> If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. . . . [T]he trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision.

Shelton, 851 S.W.2d at 138.

Following the indictment in this case, Crim filed a motion for a bill of particulars requesting the State to elect the offenses upon which it intended to rely at trial. There is no written response to the motion in the record on appeal. During the hearing on Crim's motion for judgment of acquittal, the State presented a chart illustrating its election of offenses.[3] The State then orally elected the offenses and the evidence that it wanted the jury to apply to each count. Here, the indictment charged the defendant with eight counts of child rape, which Tennessee Code Annotated § 39-13-522(a) defines as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age. The State narrowed the parameters of each count of rape between 2004 and 2007 to the Carthage Highway address. It then elected the eight counts of child rape as follows: (1) when H.F. wanted to go swimming and Crim told her that she had to give him a "blow job" before he allowed her to go swimming; (2) the second time Crim made H.F. give him a "blow job"; (3) the first time Crim performed oral

___

[3]This chart is not included in the record on appeal.

sex on H.F., H.F. was naked from the waist down and wearing a shirt; (4) the second time Crim performed oral sex on H.F., H.F. was naked from the waist down and wearing a different shirt; (5) the first time Crim made H.F. get on her hands and knees before "rubbing his private against [hers]," telling her to look down, and inserting his penis both on and inside of H.F.'s vagina; (6) the second time Crim made H.F. get on her hands and knees, but did not tell her to look down, and rubbed his penis on and inside her vagina; (7) when Crim told H.F. to undress in his bedroom, got on top of her, rubbed his penis inside the opening of H.F.'s vagina until he ejaculated, and sperm got on H.F.'s buttocks; and (8) when a thunderstorm frightened H.F. and she went into Crim's room where he was trying to "stick his private into [hers] . . . ." The election of offenses for the aggravated sexual battery convictions were related to when Crim made H.F. undress, lay on his bed, and rubbed his penis on her vagina, and when he touched H.F. while they were driving home from her aunt's house. H.F. stated that these incidents occurred approximately twice during each visit of the summers between 2005 and 2007. In addition, the State and trial court explained election to the jury and the trial court instructed the jury that a unanimous verdict was required on each offense. Following the State's oral election before the trial court, it then made the same oral election of offenses before the jury.

The record shows that H.F. vividly recalled the circumstances of each penetration. As an initial matter, each count was narrowed to one month in each summer between 2004 through 2007 at Crim's home, the Carthage Highway address. While the first two elected offenses involved the victim performing fellatio on Crim; one involved Crim negotiating with H.F. to perform fellatio in exchange for permission to go swimming and the other did not. Similarly, the remaining offenses were distinguished by a thunderstorm, different sex acts or positions, and different clothing. The eight counts which the State elected were clearly distinguished from each other to ensure jury unanimity. In addition, the trial court thoroughly explained that the jury must "reach an agreement on each particular count" and that the State must explain "which proof applies to which count, because if they did not" the verdict would not be unanimous. We must presume the jury followed the court's instruction. See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994), cert. denied, 516 U.S. 829 (1995); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App.1996). Accordingly, we conclude that the State's election identified and distinguished the offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each count. The State also supported its election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt. Crim is not entitled to relief on this issue.

**III. Sentence.** Crim also argues that his sentence is excessive given the facts and circumstances of the case. Specifically, he argues that the trial court's reliance on certain enhancement factors was incorrect and that, considering his age, Crim's sentence of 212 years is excessive. The State responds that we should remand this case for a new sentencing

hearing because the trial court should have sentenced Crim under the pre-2005 sentencing laws and because the trial court incorrectly applied enhancement factors. However, the State asserts that the trial court correctly ordered that Crim serve his sentences consecutively. We agree with the State.

In response to Blakely v. Washington, 542 U.S. 296 (2004), the Tennessee General Assembly amended large portions of the Criminal Sentencing Reform Act of 1989 effective June 7, 2005. See 2005 Tenn. Pub. Acts ch. 353. The legislature mandated that the amendments would apply to defendants who committed a criminal offense on or after June 7, 2005. 2005 Tenn. Pub. Act ch. 353, § 18. Additionally, if a defendant committed a criminal offense on or after July 1, 1982, and the court sentenced the defendant after June 7, 2005, such defendant may elect for the court to sentence him or her under these later provisions by executing a waiver of their ex post facto protections. Id.

The pre-2005 sentencing act required the trial court to begin its determination of the appropriate sentence with a "presumptive sentence." T.C.A. § 40-35-210(c) (Supp.1998). For Class A felonies, the presumptive sentence was the midpoint of the appropriate range for the offense. Id. For Class B, C, D, and E felonies, this presumptive sentence was the minimum in the appropriate range for the offense. Id. After the trial court established the presumptive sentence, the court was required to enhance the sentence within the appropriate range based on the existence of any relevant enhancement factors and was required to decrease the sentence based on the existence of any relevant mitigating factors. Id. § 40-35-210(d), (e) (Supp.1998). In the pre-2005 sentencing act, the trial court was granted discretion in determining the weight given to any enhancement or mitigating factor as long as the trial court followed the provisions of the Sentencing Act and supported its findings by the record. State v. Souder, 105 S.W.3d 602, 606 (Tenn. Crim. App. 2002). The only limitation on the trial court's discretion was that the enhancement factors (1) must be "appropriate for the offense" and (2) not "essential elements of the offense." See T.C.A. § 40-35-114 (1997). Facts supporting enhancement factors in the trial court need only be proven by a preponderance of the evidence. State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000).

The 2005 amendments set forth certain "advisory sentencing guidelines" which the trial court is required to consider but is not bound by. See T.C.A. § 40-35-210(c). Although the application of factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." Id. § 40-35-210(b)(5). The trial court is also required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." Id. § 40-35-210(d).

-14-

Crim committed the offenses between 2004 and 2007, and the court sentenced him on March 16, 2010. The indictment listed the dates of the offenses as occurring between the "___day of ___, 2004 and the ___day of___, 2007." The trial court sentenced him "pursuant to the sentencing law which was in effect before July 1, 2007, but after July 1, 2005." Based on the proof at trial, it is uncertain which offenses occurred before the 2005 sentencing amendments and which occurred after. Besides the victim's testimony that she visited the defendant for Christmas in 2004 and four weeks during the summers between 2005 and 2007, no further proof regarding which offenses occurred before the 2005 sentencing amendments and which occurred after exists. Because Crim did not execute an ex post facto waiver to allow the court to sentence him under the 2005 sentencing amendments and because the proof does not indicate which offenses occurred after the 2005 amendments the court should have sentenced him under the pre-2005 sentencing laws. Thus, we remand the case back to the trial court for a new sentencing hearing under the correct sentencing laws.

Regarding the trial court's imposition of consecutive sentences, where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven criteria in section 40-35-115(b). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Id. § 40-35-103(2).

Here, the trial court found that criterion (5) applied to Crim's case. Criterion (5) states that

> [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

T.C.A. § 40-35-115(b)(5). We agree. The jury convicted Crim of eight counts of rape of a child and six counts of aggravated sexual battery based on his abuse of his daughter over a three-year period. The statute has supported and authorized the trial court's imposition of consecutive sentences. Accordingly, we conclude that the trial court correctly ordered consecutive sentences.

## CONCLUSION

Upon review, we affirm the trial court's denial of the motion to suppress and judgments of conviction, and we remand only for a new sentencing hearing.

_____
CAMILLE R. McMULLEN, JUDGE